# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Information associated with the cellular telephone<br>assigned call number (323) 245-2978 that is stored at<br>premises controlled by T-Mobile, USA | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 22-sw-00083-NRN |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the _State and_ District of _Colorado and elsewhere_, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and Possession of Controlled Substances with the Intent to Distribute |
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possess Controlled Substances with the Intent to Distribute |

The application is based on these facts:

☒ Continued on the attached affidavit, which is incorporated by reference.

*s/ Joel Hegarty*
_____
*Applicant's signature*

Joel Hegarty, Special Agent, ATF
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.

☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:  _01/25/2022_

_____
*Judge's signature*

City and state:  _Denver, CO_

Magistrate Judge N. Reid Neureiter
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

1. This warrant applies to records and information associated with the cellular device assigned call number **(323) 245-2978** (the "Subject Account") that is in custody or control of T-Mobile, USA**,** a wireless communications service provider that is headquartered in Bellevue, Washington, with additional offices at 4 Sylvan Way, Parsippany, NJ 07054.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be Disclosed by T-Mobile, USA ("Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Subject Account listed in Attachment A for the time period December 1, 2021, to present:

A.  *Prospective Location Information*. The Provider shall provide all prospective location information about the location of the Subject Account described in Attachment A for a period of **thirty days**, during all times of day and night. The thirty-day period commences at the time of service of this warrant on the Provider, or 14 days from the issuance of this warrant, whichever comes first.  "Information about the location of the Subject Account" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A**.** To the extent that the location information is within the possession, custody, or control of Provider, Provider is required to disclose the Location Information to the government.  Requested information further includes:

i.  Records of user activity for each connection made to or from the Subject Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

ii.  Information about each communication sent or received by the Subject Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers);

All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Subject Account, to include all <u>voice, SMS, MMS, and data activity</u>; and

iii.  All records containing round-trip-distance measurements and/or timing advance information for each connection made to or from the Subject

Account (GSM, CDMA, EVDO, UMTS, LTE, etc.), to include NELOS, RTT, True Call Measurement Data, PCMD records, and Reveal Reports.

In addition, Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the Subject Account on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

B. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

C. *Pen register/trap and trace information.* Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the installation of the pen register / trap and trace device under 18 U.S.C. § 3124. Provider shall also make available information associated with each communication to and from the Subject Account for a period of 30 days from the date of this warrant. The thirty-day period commences at the time of service of this warrant on the Provider, or 14 days from the issuance of this warrant, whichever comes first. This information includes:

    i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    ii. Source and destination telephone numbers;

    iii. Date, time, and duration of communication; and

    iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Subject Account will connect at the beginning and end of each communication.

D. *Historical Information.* Information about the customers or subscriber of the Subject Account including the following:

    i. Names (including subscriber names, user names, and screen names);

    ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii. Local and long distance telephone connection records;

    iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v. Length of service (including start date) and types of service utilized;

    vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

 vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

 viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

E. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Subject Account, including:

 i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

 ii. All historical location information, including data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Subject Account.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846, during the period December 1, 2021, through the end of the period authorized by this Order.

Pursuant to 2703(g), the presence of an agent is not required for service or execution of this warrant. Law enforcement personnel (who may include, in addition to law enforcement officer and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its review. If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team. If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Joel Hegarty, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703I(1)(A) for information about the location of the cellular telephone assigned call number (323) 245-2978 (the "Subject Account")

2.      The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703I(1)(A) to require T-Mobile, USA to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3123(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

4.      Your affiant, Joel Hegarty, is a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, Denver, Colorado. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. §  2510(7), that is, an officer of the United States empowered by law

1

to conduct investigations of, and to make arrests for, offenses enumerated by statute in the United States Code. I am authorized under Federal Rule of Criminal Procedure 41(a)(1)(C) as a federal law enforcement officer who is engaged in enforcing the criminal laws and am within any category of officers authorized by the Attorney General to request a search warrant.

5.      I have been employed as a Special Agent with the ATF for approximately two (2) years. My primary duties consist of the enforcement of federal firearms laws, armed narcotics trafficking laws and conspiracy laws. I have conducted numerous investigations regarding these laws as an ATF Special Agent. Prior to graduating from the Federal Law Enforcement Training Center in 2020 and becoming an ATF Special Agent, I was employed with Ernst and Young for over 4 years, working as a Senior Forensic Accountant in Ernst and Young's forensic accounting practice. I have authored and participated in the execution of numerous federal and state search warrants involving violent crime, organized crime, illegal firearms possession, and the use and trafficking of narcotics.

6.      Many of my cases have involved analysis of call detail records pertaining to cell phones. I have become familiar, through training and experience, with the type of evidence which may be found in call detail records and how these records must be examined. I also work with other law enforcement officers with decades of experience analyzing call detail records and I utilize their knowledge of those experiences.

7.      I have been involved in numerous investigations of parties involved in the illegal sales, distribution, and use of narcotics. I have taken part in the execution of numerous search warrants and seized large quantities of illegal narcotics. I also works with other law enforcement officers with decades of experience investigating illegal drug trafficking and drug trafficking organizations and I utilize their knowledge of such investigations.

2

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.      Based on the facts set forth in this affidavit, there is probable cause to believe that a search of the items identified in Attachment A, for the information described in Attachment B, will yield evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (the "Subject Offenses").  Moreover, I submit that there is probable cause to believe that the Subject Account is being used to facilitate the commission of the Subject Offenses, and that the information described in Section II of Attachment B will yield evidence of the Subject Offenses.

10.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

11.     The United States, including The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), is conducting a criminal investigation of Gabriel CABRERA and both identified and unidentified co-conspirators regarding possible violations of 21 U.S.C. §§ 841(a)(1), 846, 18 U.S.C. § 922(g)(1), and 18 U.S.C. § 924(c), (hereinafter "the Subject Offenses").  CABRERA's criminal history shows felony convictions that include Possession of a Firearm by a Person Previously Convicted of a Crime of Domestic Violence, Possession of a Controlled Substance, Vehicle Theft, Drug Paraphernalia

Possession, and Aggravated DUI with a Passenger Under the Age of 15. CABRERA has an arrest record dating back to 2000 in several different states.

12.     In November of 2021, the ATF began an investigation into an armed narcotics trafficking criminal street gang in the Denver, CO area, stemming from information obtained from numerous law enforcement databases showing a specific area with a large amount of recent crime involving the use of illegally possessed firearms in the hands of prohibited individuals.  Based upon this information, an ATF Confidential Information, CI-11994 [hereinafter referred to as "the CI"] was directed by your affiant to frequent these high-crime locations to obtain information relating to individual(s) engaged in criminal activity. The CI has been given monetary compensation in exchange for giving law enforcement reliable information on criminal activities on dozens of prior occasions. He  is not trying to reduce any sentence in exchange for his cooperation.

13.     According to the CI, on November 13, 2021, the CI met a male individual at a motel in Lakewood, CO, who introduced himself to the CI as "Luke," and was subsequently identified Luke ANAYA [hereinafter referred to as "ANAYA"]. Also on November 13, 2021, ANAYA, a convicted felon, advised the CI that he is a Blood gang member and told the CI that he could source the CI with ounce quantities of meth, for $200 per ounce. The CI exchanged phone numbers with ANAYA and advised that he/she would be in contact, after speaking with the CI's boss, who is an ATF Undercover agent.

14.     Between November 13-18, 2021, at the direction of Your Affiant, the CI engaged in conversation with ANAYA discussing a purchase of methamphetamine. On November 18, 2021, the CI and an ATF Special Agent [hereinafter referred to as "the UC"], working in an undercover capacity, conducted an undercover controlled purchase from ANAYA. The UC purchased approximately twenty-five (25) grams of suspected methamphetamine from

ANAYA in Lakewood, CO. The suspected methamphetamine subsequently field tested positive for methamphetamine.  The following is a photograph of the purchased evidence from November 18, 2021 (Fig. 1):



Fig. 1

15.     On December 1, 2021, the CI and the UC met with ANAYA again at a hotel in Lakewood, CO. During the meeting, the UC and the CI were introduced by ANAYA to Samuel QUESADA, who is a convicted felon and self-identified associate of a street gang in California. QUESADA then made a telephone call to an unknown individual and then stated that he would have had three (3) ounces of methamphetamine ready for the UC and the CI to purchase if QUESADA had known that they were coming. QUESADA stated that his methamphetamine source was in the area of 84th Ave. and Wadsworth Blvd. in Westminster, CO, and further stated that it would take his narcotics source about 90 minutes to bring the methamphetamine to the hotel. The UC stated that they would contact QUESADA at a future date to arrange for the purchase of methamphetamine. QUESADA

said that the UC and CI could contact him, and then QUESADA gave the UC and the CI his phone number.

16.     Between December 9, 2021, and January 14, 2021, at the direction of Your Affiant, the CI engaged in conversation with QUESADA discussing the purchase of methamphetamine. On Friday, January 14, 2022, QUESADA provided the CI with the address 1260 Vrain St, Apartment 301, Denver, CO 80204, as the location to meet to purchase methamphetamine from QUESADA. Later on January 14, 2022, the CI and the UC met QUESADA at the previously provided location. During the meeting, QUESADA introduced the CI and the UC to QUESADA's source of supply for methamphetamine, who was subsequently identified as Gabriel CABRERA. Once inside the previously described apartment, QUESADA and CABRERA had a brief conversation and CABRERA began searching through a black backpack that he was carrying. CABRERA then reached into his waistband area, and also into the backpack, and subsequently took out two pistols, a black semi-automatic pistol and a two-tone silver over black semiautomatic pistol, and then placed both pistols on a nearby shelf in plain view where both the UC and the CI could observe the firearms. The firearms remained in place on the shelf near CABRERA and in plain view during the narcotics transaction with CABRERA.

17.     CABRERA took out a large plastic bag from the backpack, which contained approximately three or four pounds of suspected methamphetamine based on the UC's previous experience in purchasing large quantities of narcotics. The UC and CABRERA then engaged in conversation regarding purchasing the suspected methamphetamine and CABRERA asked the UC and CI what they wanted, and the CI replied, "QP (¼ lb./4 oz.)." While CABRERA was getting the suspected methamphetamine out of one of the large plastic bags that he had taken out of his black backpack, he gave the CI and the UC his cell

phone number of "323-245-2978" (the Subject Account) and told the CI to contact him.

CABRERA then placed four one-ounce pre-packaged bags of suspected methamphetamine

on the same shelf where the firearms were located and also gave the UC an additional large

piece of suspected methamphetamine for the UC to sample.

18.     The UC took the four one-ounce baggies of suspected methamphetamine and the

additional piece of suspected methamphetamine and placed them into his coat and then

replied, "Nine ($900) right?" The UC then paid CABRERA $900 of pre-recorded U.S.

Currency/ATF buy money for the purchase of the 124 grams (4.4 oz.) of suspected

methamphetamine.

19.     The UC then looked at the two pistols that CABRERA had placed on the shelf and

stated, "You looking to get rid of any of that shit man? I got some extra for that kinda

shit?" and CABRERA replied, "What's that? I'm selling that little one there for, well I paid

seven ($700) for it. It's a nine (9mm)." The UC replied, "I could do probably do that if you

want to get rid of it bro. How much you got in it? Seven ($700)? I'll give you eight ($800)

bro," and CABRERA replied, "All right, give me eight ($800)." The UC then subsequently

paid CABRERA $800 of pre-recorded U.S. Currency/ATF buy money for the purchase of

the Taurus Model G2C (PT111 G2A) 9mm pistol bearing serial number TMB54622, which

was loaded with one (1) round of Federal 9mm caliber ammunition.

20.     The UC and CABRERA then briefly discussed the UC making a larger ½ lb.

quantity purchase of methamphetamine next time, and also discussed the possibility of

purchasing "blues" or oxycontin pills, heroin, and fentanyl from CABRERA, who stated

that he had access to all of the above listed narcotics and would be willing to also sell those

narcotics to the UC at a future date.

21.     The suspected methamphetamine subsequently field tested positive for

methamphetamine.  A records check was conducted on the purchased firearm with negative

results for stolen firearms.  The following are photographs of the purchased evidence from

January 14, 2022 (Fig. 2-Fig. 3):



Fig. 2



Fig. 3

22.     Between January 14 and January 20, 2022, the CI continued to engage in conversation with QUESADA regarding an additional purchase of methamphetamine. On January 20, 2022, QUESADA and CABRERA met up with the CI and the UC at a location in Denver, CO. The UC conducted an undercover controlled purchase from CABRERA. During the meeting, the UC paid CABRERA $900 of pre-recorded U.S. Currency/ATF buy money for the purchase of approximately one hundred nineteen (119) grams (4.2 oz.) of suspected methamphetamine.  The suspected methamphetamine subsequently field tested positive for methamphetamine. The UC and CABRERA then discussed a future purchase of a larger quantity of methamphetamine. CABRERA told the UC that CABRERA would be travelling to California by car at the end of the following week (around January 28, 2022) to pick up approximately twenty (20) pounds of methamphetamine from CABRERA's source of supply for methamphetamine.

23.     On January 21, 2022, the CI engaged CABRERA in conversation through text messages between the CI and the Subject Account.  CABRERA communicated with the CI utilizing the phone number "323-245-2978" (the Subject Account), which CABRERA had previously given the CI.

24.      In short, via recorded text message communications between the CI and CABRERA, the CI asked CABRERA if it is ok for the CI to give "the homie" (the UC) CABRERA's phone number so that the UC could communicate with CABRERA directly. CABRERA responded "Yes," that it was ok for the CI to give the UC the phone number for the Subject Account so that the UC could then directly communicate with CABRERA.

25.     Law enforcement was able to determine that T-Mobile is the provider for the Subject Account.

## SUMMARY

26.     For the reasons set forth above, I believe that CABRERA is actively involved in committing and facilitating the Subject Offenses and is using the Subject Account to facilitate those offenses.

27.     I therefore respectfully assert that the facts set forth in this affidavit show there is probable cause to believe that a search of the locations described in Attachment A for the items described in Attachment B will yield evidence of the Subject Offenses.

28.     I respectfully assert that the facts set forth in this affidavit show there is probable cause to believe that CABRERA is using the Subject Account to commit the Subject Offenses.

29.     I know, based upon training and experience, that members of interstate drug trafficking conspiracies use cell phone communications to coordinate the movement of drugs and drug proceeds between various source, transshipment, and distribution locations. I believe that the activation of a Pen Register Trap and Trace Device over the Subject Account would allow law enforcement agents to identify other phones in contact with the Subject Account, which would assist law enforcement agents in identifying other associates of the user of the Subject Account who may be involved in this suspected narcotics possession and distribution conspiracy.

30.     I know, based upon training and experience, that members of drug trafficking and money laundering conspiracies often travel to carry out necessary aspects of the conspiracy, including to meet other members of the drug conspiracy, to visit drug stash locations, to meet drug couriers, to collect drug proceeds, and to conduct a variety of other activities that promote the overall conspiracy. I believe that prospective location information related to the Subject Account would assist law enforcement agents in

conducting surveillance of the user of the Subject Account and identifying co-conspirators with whom he may meet and reveal locations that are utilized for the purpose of possessing and distributing illegal narcotics.  Similarly, historical location information will provide information about where the user or users of the Subject Account reside and spend a majority of their time, because in modern life, people typically keep their cellular telephones with them much of the time, even while sleeping.  Accordingly, historical location information may lead to the identification of past patterns of movement and residence for the users of the Subject Account, which may lead to the identification of stash locations for narcotics, narcotics proceeds, or both.

31.     In my training and experience, I have learned that T-Mobile, USA is a company that provides cellular telephone access to the general public, including the Subject Account. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless

device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

32.      Based on my training and experience, I know that T-Mobile, USA can collect E-911 Phase II data about the location of the Subject Account, including by initiating a signal to determine the location of the Subject Account on the T-Mobile, USA network or with such other reference points as may be reasonably available.

33.      Based on my training and experience, I know that T-Mobile, USA can collect historical and prospective cell-site data about the Subject Account. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers, such as T-Mobile, USA, typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Subject Account's user or users and may assist in the identification of the user's associates or locations the user obtains, stores, or sends illegal narcotics.

34.      Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number

("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module

("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"),

an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile

Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device

to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the

identity of the cellular device making the communication without revealing the

communication's content.

35.     Based on my training and experience, I know that wireless providers such as the

Provider typically collect and retain information about their subscribers in their normal

course of business. This information can include basic personal information about the

subscriber, such as name and address, and the methods of payment (such as credit card

account number) provided by the subscriber to pay for wireless communication service. I

also know that wireless providers such as the Provider typically collect and retain

information about their subscribers' use of the wireless service, such as records about calls

or other communications sent or received by a particular device and other transactional

records, in their normal course of business. In my training and experience, this information

may constitute evidence of the crimes under investigation because the information can be

used to identify the Account's use or users and may assist in the identification of co-

conspirators and/or victims.

## AUTHORIZATION REQUEST

36.     Based on the foregoing, I request that the Court issue the proposed search warrant,

pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703I.

37.     I further request that the Court direct T-Mobile, USA to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

38.     Due to fact that drug trafficking activities occur at all hours of the day and night, I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Subject Account outside of daytime hours.  Because the warrant will be served on T-Mobile, USA, who will then compile the requested records at a time convenient to it, execution of the warrant after 10:00 p.m. and before 6:00 a.m. will not cause any greater intrusion upon CABRERA than will be caused by execution during daytime hours. Moreover, there is probable cause to believe that obtaining the requested location information on a 24-hour basis will further the ongoing investigation."  Specifically, location information regarding where a drug trafficker resides during nighttime hours will often provide essential evidence regarding drug stash locations, as drug traffickers frequently store drugs and other evidence at their residence.  I also know from my training and experience that drug traffickers will frequently operate during nighttime hours in an effort to evade detection by law enforcement.  In particular, loads of controlled substances are frequently transported during nighttime hours for this reason.

39.     Because the warrant will be served on T-Mobile, USA, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

40.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until the date specified in the application for this warrant.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result,

14

as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Subject Account would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).  The requested date, which is 74 days as measured from the date of this application, is inclusive of: 14 days to permit execution of this warrant, the 30-day authorized period of monitored location information, and a 30-day initial delay of notification.

41.     I further request that the Court direct T-Mobile, USA to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile, USA.  I also request that the Court direct T-Mobile, USA to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile, USA' services, including by initiating a signal to determine the location of the Subject Account on the T-Mobile, USA network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

42.     I further request that this Court order T-Mobile, USA not to notify the subscriber of the existence of the warrant. The requested warrant relates to an ongoing investigation

which involves the proactive use of cooperating individuals. I believe that notification

would result in flight from prosecution, the destruction of evidence, harm to cooperating

individuals, or otherwise seriously jeopardize this investigation. See 18 U.S.C. §

2705(b)(2), (3), (5).

Respectfully submitted,

*s/ Joel Hegarty*
Joel Hegarty
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Submitted, attested to, and acknowledged by reliable electronic means before me on
January 25, 2022.

THE HON. N. REID NEUREITER
UNITED STATES MAGISTRATE JUDGE

**Reviewed and Submitted by Thomas Minser, Assistant United States Attorney.**

**To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant will also
function as a pen register order.  I, Thomas Minser thus certify that the information
likely to be obtained is relevant to an ongoing criminal investigation conducted by the
above agency.  *See* 18 U.S.C. §§ 3122(b), 3123(b).**